Filed 1/8/15  In re Veronica E. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re VERONICA E. et al., Persons Coming Under the Juvenile Court Law. | C074257 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. Nos. J31069, J31070) |
| Plaintiff and Respondent, | |
| v. | |
| ERVIN B. et al., | |
| Defendants and Appellants. | |

C. E. (mother) and Ervin B. (father), parents of minors Veronica E. and Alexander E., appeal from the juvenile court's orders terminating parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395; unless otherwise stated, all statutory references that follow are to the Welfare and Institutions Code.)  Father challenges the juvenile court's finding the minors are adoptable and argues he established

the beneficial relationship exception to adoption. Mother contends she was denied due process when the court denied her request for a continuance of the section 366.26 hearing, and joins in father's arguments. We shall affirm the juvenile court's orders.

FACTS AND PROCEEDINGS

On March 8, 2004, the Butte County Department of Employment and Social Services (the Department) detained the minors, then ages three and five, due to mother's psychological issues and alcohol abuse. There also had been domestic violence in the home. According to a police report, on February 28, 2004, officers answered a call to the house regarding an overdose. When they went to the home, mother refused medical attention but admitted she had been drinking and told the officers that she wanted to kill herself. An officer placed her on a "section 5150 hold" and she was admitted to the Butte County Psychiatric Health Facility for a 72-hour evaluation.

On April 12, 2004, the juvenile court sustained section 300 petitions on behalf of the minors and adjudged the minors dependent children. Reunification services, including substance abuse treatment, were provided. Mother maintained sobriety for six months and the minors were returned to her care in December 2004 with family maintenance services. Dependency was terminated on May 23, 2005, after mother had maintained another six months of sobriety.

Mother resumed her alcohol abuse four months later and, on December 7, 2005, she was arrested and incarcerated for public intoxication and violation of probation. According to the police report, officers went to the home after father requested a welfare check, stating that he had just talked to mother on the phone, that she sounded intoxicated, and that the minors were with her. An officer reported that mother had red, watery eyes, slurred speech, was unsteady on her feet, and smelled of alcohol. She claimed she was not intoxicated and that she only had one beer earlier in the day. She

2

displayed mood swings ranging from calm to crying, screaming and yelling. She was arrested for public intoxication. The minors were left in father's care.

On December 8, 2005, the minors were detained again and new section 300 petitions were filed. The petitions included allegations regarding the December 7, 2005 incident, in which mother had attempted suicide with alcohol and pills, as well as an allegation that mother had been driving while under the influence with the minors in the car. On February 8, 2006, the juvenile court adjudged the minors dependent children and placed the minors with the father with family maintenance services. Dependency was terminated on September 20, 2007, with primary custody to mother (although mother and father were living together).

Mother's alcohol abuse and the parents' domestic violence continued. On September 21, 2009, mother failed to pick up the minors, then ages nine and 11, from school. The minors waited for over an hour and, after the school was unable to contact the parents, they walked to a friend's house. When mother eventually arrived at the school, she was extremely intoxicated. She was not driving. She said that she was late picking the minors up because father had beaten her up and was in jail.

When the minors did not come to school the next day (September 22, 2009), the school called the Department. Social worker Pamela Richards then went to the Regal Inn, where mother was living, to check on the minors. When she arrived, mother was asleep. The minors said that mother had been awake earlier and they were asked to wake her. Mother then came to the door and explained that father had beaten her and she was dizzy and having vision problems. At some point, the motel manager came by and reminded mother to let him know when father was going to be released from jail so he could go pick him up. Richards had been talking to mother about domestic violence and the risk to the minors. Although Richards attempted to convince her otherwise, mother said she was not going to press charges and was going to allow father to return to the motel. She stated that she did not have a driver's license and father took the minors to

3

school. Mother was unable to complete her sentences and swayed while walking. She admitted that she had been drinking vodka earlier that morning and had not taken her prescribed medication, Adderall and an antidepressant.

On September 24, 2009, section 300 petitions were again filed on behalf of the minors. The petitions contained allegations under section 300, subdivisions (b) and (c). The juvenile court declared the minors dependents and ordered them to remain out of the parents' custody. The court ordered reunification services for father but denied reunification services for mother pursuant to section 361.5, subdivision (b)(13), finding mother had a history of extensive alcohol abuse and had both resisted court-ordered treatment within the three years prior to the instant petition and refused to comply with a program of court-ordered alcohol treatment on two prior occasions.

A year later, visits were still supervised, which the minors expressly preferred. Parents often showed up late for the visits and the minors were "guarded" in their interactions with their parents. The minors had developed a respectful and affectionate relationship with their foster mother, with whom they had been placed since their most recent September 2009 removal. They were comfortable and secure in her home and the foster mother wished to provide permanence for the minors via adoption if reunification efforts were unsuccessful. Father's reunification services were terminated and a section 366.26 hearing was set for May 5, 2011.

A CASA (court appointed special advocate) report was filed on April 26, 2011. The report said that the minors had stated on numerous occasions that, while they love their parents, they want to be adopted by their foster mother, with whom they are bonded. The minors believed adoption would provide them with permanency and stability, which is very important to them. Veronica believed that if they were returned to the parents, "they would just end up in foster care again." Alexander wanted to be adopted so that it would be a "permanent situation." Although the minors wanted to have continued

4

contact with their parents, they did not want to live in the chaotic environment that living with the parents entailed.

The social worker filed a section 366.26 report on May 4, 2011, which recommended the minors be placed in a permanent plan of adoption and parental rights be terminated. An adoption assessment was provided by state adoptions that indicated the minors are adoptable with their foster mother as the prospective adoptive parent. The minors, then ages 11 and 13, were in good physical, mental, and emotional health. They had been interviewed several times and unwaveringly stated that they wished to be adopted by their foster mother. The minors also said they would like to continue to see their parents, as well. Both minors were parentified and carried a heavy sense of responsibility and protection for their parents. Alexander expressed fear that, if he did not stay in touch, mother would harm herself as she had threatened in the past, and he would feel responsible if she did. The minors, however, had a substantial emotional tie to their foster mother and relied on her for their sense of security and stability. The adoption assessment recommended termination of parental rights and adoption as the permanent plan.

On June 23, 2011, this court stayed the section 366.26 hearing in connection with mother's previous appeal from the dispositional orders and the juvenile court set the matter for a review hearing for the following month.

The minors continued to thrive in their placement with their foster mother. Visits had been reduced to one visit every three weeks, and remained supervised for the emotional comfort of the minors. The minors indicated they did not want the visitation schedule increased in frequency. Another review hearing was scheduled for February 2012.

The social worker's report for the February 2012 hearing indicated the minors still wanted to be adopted by their foster mother and were upset about the length of time the process was taking. The minors' therapist stated that, although she could not find the

5

visits between the minors and parents detrimental, she was concerned about the role reversal and potential manipulation of the minors. Additionally, the therapist reported that after visits, Veronica becomes hyperactive and Alexander becomes disengaged.

In July 2012, the minors were reportedly still thriving in their foster mother's care and they still wanted her to adopt them. By September 2012, Alexander had started high school and Veronica was in junior high school. They remained adamant that they wanted to be adopted by their foster mother, with whom they had been living for over three years. The minors expressed frustration that the process for adoption was taking so long. The minors' therapist reported the minors were coping with the situation well. They did not want to return to their parents' care and believed the parents are superficial and have never apologized for their own mistakes.

This court's opinion affirmed the juvenile court's dispositional orders adjudging the minors dependents and denying mother reunification services. (In re Veronica E. et al. (Aug. 8, 2012, C064723) [nonpub. opn.].)

This court's remittitur issued on October 22, 2012, dissolving the stay, and a new section 366.26 hearing was set. The social worker filed an amended section 366.26 hearing report on January 18, 2013, recommending a permanent plan of adoption.

The minors were healthy and developmentally and educationally on target. State adoptions had completed an adoption assessment and assessed the foster mother's home as their potential adoptive home, but had not made an adoptive placement due to some unspecified concerns with the home. A 180-day continuance was requested to continue with the assessment, as there could be a need to find an alternate placement if the concerns continued. Additionally, the parents had expressed concern that the minors were showing interest in participating in various extracurricular activities and the foster mother had not followed through. The court continued the matter to March 2013, which was subsequently moved to April 2013, after father sought disqualification of the assigned judge.

6

By the time the contested hearing proceeded on June 21, 2013, Veronica was 13 years old and Alexander was 15 years old. They had been placed in foster care three separate times over the past 10 years and had been living with their current foster mother for almost four years. They had been interviewed on numerous occasions and steadfastly expressed their desire to be adopted by their foster mother. They stated: "I don't understand why this is taking so long. If we are not going back with our parents then why do they still have their parental rights and have we not been adopted yet? We just want to live our lives and be able to have the freedoms of no longer being in foster care. We want to stay living here[;] we do not want to move to any other home." The minors expressed their desire for permanence and stability, and to have their foster mother make the legal parental decisions on their behalf. They reportedly wanted to continue to have contact with their parents, but wanted that contact to be at their discretion.

The minors' foster mother was completing the prospective adoptive parent training and home study. The adoption specialist testified that the minors were very clear about their desire to remain in their current placement and have foster care come to an end. They wanted their foster mother to make parental decisions on their behalf without going through the court, the Department, or the parents. The adoptions specialist discussed the differences between guardianship and adoption with the minors, and explained termination of parental rights. The minors were clear that they did not want long-term foster care. They were not opposed to guardianship if it would get them to permanence faster, but preferred adoption.

With respect to maintaining contact with their parents, the minors felt that the current frequency of visits was acceptable (every three weeks, for an hour) and that it was enough to just be able to "check in" and get updates on how their parents are doing. The adoptions specialist explained that the minors worry about their parents and seeing how their parents are doing relieves some of their worries. The minors understood, however, that if they were adopted, their foster mother, as their adoptive mother, would decide if

7

they would continue to have contact with their parents and the minors believed she would make a "good decision on that end." They did have some anxiety about the possibility that visits would be unsupervised. The foster mother had indicated she was amenable to postadoption contact between the minors and parents, but no formal agreement had been reached.

The social worker who had supervised many of the visits testified that the parents brought (sometimes excessive) activities and sweets to visits, and greeted the minors with hugs and mutual statements that they love each other. For the previous six months or so, the parents had been visiting separately at their request. Father explained that he felt he was able to interact with the minors more when mother was not present. During visits, father engaged the minors in conversation about school and activities, and father was teaching Alexander how to throw a baseball. His interactions with the minors were appropriate. Visits with father ended affectionately and with the minors telling him they love him. Mother had come to a visit intoxicated and incoherent in December 2012. She was also often upset at visits. The minors expressed that they did not want visits with mother unless she was "okay." Father stated that the minors did express concern to him about mother and opined they had concerns about her alcoholism.

The minors were in good physical, emotional, and mental health, and were on target both developmentally and educationally. The adoption specialist stated she had no doubt the minors were adoptable. The Department proposed the juvenile court find they were specifically adoptable because their foster mother wished to adopt them. Counsel for the minors argued they were generally adoptable.

The juvenile court found the evidence beyond clear and convincing that the minors were likely to be adopted. The court stated the minors were sufficiently mature and intelligent to consider their wishes, which was unwaveringly for them to find permanency and be adopted. The court also found the beneficial parental relationship exception did

not apply. The court then terminated parental rights and identified adoption as the permanent plan.

DISCUSSION

I

*Adoptability*

Father challenges the juvenile court's finding that the minors are adoptable. Mother joins in this argument. We conclude the court's finding was amply supported by the evidence.

"In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164; see also § 366.26, subd. (c)(1).) Usually, the issue of adoptability focuses on the minor, "e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) However, "in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id.* at p. 1650.)

The juvenile court found the minors were likely to be adopted but did not make a finding that the minors were adoptable only because there was a prospective adoptive parent willing to adopt them. The minors, although physically and mentally healthy, and developmentally and educationally on target, are teenagers and members of a sibling group. Thus, while not an indication that adoption is not probable, arguably they could be difficult to place. (See § 366.26, subd. (c)(3); *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1438.) Assuming, as father contends, the juvenile court found the

9

minors adoptable because their foster mother was willing to adopt them, the record supports the court's finding.

In instances where the likelihood of adoption is based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any "legal impediment" to adoption. (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) The legal impediments to adoption are found in Family Code sections 8601, 8602, and 8603, and provide that a prospective adoptive parent must be at least 10 years older than a child unless certain exceptions apply, a child older than 12 must consent to adoption, and a prospective adoptive parent not lawfully separated from a spouse must obtain consent from the spouse. (*Sarah M.*, at p. 1650.)

"[A]s a general rule, the suitability of the prospective adoptive family does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) However, the statutory scheme requires a "preliminary assessment" (§ 366.21, subd. (i)(1)(D)) of the prospective adoptive parent and "[a]n analysis of the likelihood" that the minors would be adopted (§ 366.21, subd. (i)(1)(G)) when the court orders a hearing pursuant to section 366.26 (§ 366.21, subd. (i)). A completed adoptive home study is not a statutory prerequisite for termination of parental rights. (§ 366.26, subd. (c)(1).) Instead, it is required only after a minor is freed for adoption and an adoption petition is filed. (Fam. Code, § 8715, subd. (b).)

Here, the foster mother's home, as a prospective adoptive home, had been assessed and evaluated. The minors had been living in the home for four years. The home study was almost complete which, as described by the social worker, included obtaining "information and assessment of psychosocial factors including history, personal characteristics, marital/domestic partnership relationships, those residing in the home, extended family relationships, physical/social environment, general parenting, specialized parenting, and adoption issues." The minor's foster mother/prospective adoptive mother

10

had completed the adoption preparation training, six and a half hours of the home study process, and fingerprint clearance. The social worker was waiting for the prospective adoptive mother's physical and TB test, divorce decree, and two references. Children's services had found no barriers, had no concerns, and reported that they were likely to approve the home for adoption.

Father emphasizes that there had been some earlier unspecified concerns about the home in December 2012, but those concerns were resolved and the adoptions specialist stated that there were no ongoing concerns. Father also emphasizes there had been earlier concerns about the prospective adoptive mother following through with extracurricular activities, although he acknowledges the prospective adoptive mother had subsequently addressed that concern. In any event, as we set forth above, the suitability of the prospective adoptive family does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted.

Finally, father mentions an unspecified concern regarding the prospective adoptive mother's health in February 2013. There were, however, no remaining health concerns mentioned at the time of the section 366.26 hearing. Thus, contrary to appellant's speculative claims, the record reflects an assessment had shown the prospective adoptive parent to be a probable adoptive parent for the minors.

Additionally, the prospective adoptive mother has indicated her commitment to provide the minors with the stability and permanence the minors require and no legal impediment to adoption is presented on this record. The record is quite clear that the minors had consented to adoption. The only argument father makes suggesting a legal impediment to adoption is that the social worker indicated she had not yet obtained the prospective adoptive mother's divorce decree. There was, however, no evidence suggesting she was not lawfully separated or divorced. Thus, there is no evidence of a legal impediment to adoption.

11

The juvenile court's finding of adoptability is supported by the evidence. The remainder of father's argument is centered around his contention that guardianship was a better *choice* than adoption in this case. Of course, that contention does not go to the adoptability of the minors.

## II

### *Beneficial Parental Relationship Exception*

Father also contends the juvenile court erred in not finding there was an exception to termination of parental rights based on his relationship with the minors. Mother purports to join in this argument but lacks standing to do so. (See *In re Frank L.* (2000) 81 Cal.App.4th 700, 703; *In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1193-1194.) In any event, we reject the contention.

At a hearing under section 366.26, if the court finds by clear and convincing evidence that a minor is likely to be adopted, the court must terminate parental rights and order the minor placed for adoption unless "[t]he court finds a compelling reason for determining that termination would be detrimental" due to one of the statutorily enumerated exceptions. (§ 366.26, subd. (c)(1)(B).) The parent has the burden of establishing a statutory exception to termination of parental rights. (Cal. Rules of Court, rule 5.725(d)(4); *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809; see *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1373.) The juvenile court's ruling declining to find an exception to termination of parental rights must be affirmed if it is supported by substantial evidence. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 809; *In re Derek W.* (1999) 73 Cal.App.4th 823, 827; cf. *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1342 [applying abuse of discretion standard].)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to adoption when "[t]he parents have maintained regular visitation and contact with the child and the child

would benefit from continuing the relationship." However, "a parent may not claim entitlement to the exception provided by [now] subdivision [(c)(1)(B)] simply by demonstrating some benefit to the child from a continued relationship with the parent, or some detriment from termination of parental rights." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349.) The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

There is no dispute that father visited the minors regularly although he was frequently late to visits. Nor is there any dispute that the minors love their parents and expressed the desire to continue contact with them. And the adoptions specialist opined that being able to check in with their parents benefited the minors in the sense that it eases their worries about how the parents are doing. However, neither a loving relationship (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523) nor the derivation of some benefit from continued parental contact (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466) is enough to establish this exception.

The evidence here showed that the minors' relationship with their parents is not a positive, healthy one. The minors are parentified and carry a sense of responsibility for their parents' well-being. Their desire to check in with their parents is driven, at least in part, by their need to see how their parents are doing in order to relieve some of their worries. The minors' therapist stated that, although she could not find the visits between the minors and parents detrimental, she was concerned about the role reversal. And the

13

therapist reported that after visits, Veronica becomes hyperactive and Alexander becomes disengaged. The evidence also showed that visits were supervised for the emotional comfort of the minors and that the minors are concerned that after parental rights are terminated, their visits (should they occur) might no longer be supervised. This evidence contradicts father's claim that the minors have a positive emotional attachment.

On the other hand, these minors, who have spent 10 years of their childhood in instability, have repeatedly and consistently expressed their need for permanence and stability through adoption since April 2011. They recognize there is no guarantee they will continue to see their parents should adoption go forward, and still express their preference for adoption over guardianship. And, in any event, in the absence of an older child's objection to adoption (which is not the case here) the child's desire to see his/her parent again does not necessarily overcome the preference for adoption. (See *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333-1337.)

The evidence supports the juvenile court's finding that the benefit to the minors from a continued relationship with father does not promote the well-being of the minors to such a degree as to outweigh the well-being they would gain in a permanent home with a new, adoptive parent.

III

*Due Process*

Finally, mother contends the juvenile court abused its discretion and violated her due process rights when it denied her request for a continuance of the section 366.26 hearing. We reject her contention.

Due process in dependency proceedings generally focuses on notice and the opportunity to be heard. (*In re B.G.* (1974) 11 Cal.3d 679, 688-689; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412-413.) Due process also requires that the proceedings be fundamentally fair. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Mother was provided

14

notice of the hearing and does not contend otherwise. Instead, mother contends the court deprived her of her right to be heard at the section 366.26 hearing when it denied her counsel's request for a continuance. In dependency cases, continuances are disfavored, shall be granted only upon a showing of good cause, and shall not be granted if to do so would be contrary to the minors' interests. (§ 352, subd. (a); *In re David H.* (2008) 165 Cal.App.4th 1626, 1635; *In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1186-1187.) " '[T]he court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' (§ 352, subd. (a).) '[T]ime is of the essence in offering permanent planning for dependent children.' [Citations.]" (*In re Gerald J.*, at p. 1187.)

The parent has the burden to establish that good cause exists for the continuance. (*Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 196.) The juvenile court is accorded broad discretion in determining whether to grant a continuance. (*In re Gerald J., supra,* 1 Cal.App.4th at pp. 1186-1187; § 352, subd. (a).) We review the denial of a continuance for an abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.)

Here, mother was aware of the hearing date, which had been specially set after having been continued for two years. Ten minutes before the 9:00 a.m. specially set hearing, she called her counsel and claimed she "had just woken up" and had "some medical issues" consisting of a sore throat and a rash on her legs. Although she told her counsel she had been to the hospital the night before, she was not currently in the hospital. Counsel explained that "[e]ssentially what she was trying to do was get a referral to residential treatment" for long-standing alcohol abuse issues. Counsel also admitted that mother self-admits to the hospital frequently. She had missed a court date in August 2011 because she had gone to the hospital for what was "apparently" asthma and pertussis, and had missed a hearing in February 2013 because she was in a crisis unit.

15

Her counsel opined that the week had been very hard on mother and, even if she were present, she would most likely be unable to go forward due to her physical and emotional well-being. We note that mother had left a previous court hearing because she was under emotional distress after Alexander testified in chambers and she learned of the minors' wishes.

First, contrary to mother's suggestion in her appellate brief, there was no indication that her request was to continue the matter for a few hours, or even a day or two, or that such a delay would have enabled mother to attend and participate in the hearing. Moreover, mother failed to show good cause for *any* continuance. All mother established was that she woke up late with a sore throat and a rash. She was not in the hospital (even self-admitted) and did not otherwise establish that she was unable to attend the hearing.

The minors here have repeatedly expressed frustration that permanency has been taking so long, and directly expressed their need for resolution of their custody status and for a stable and permanent home. The juvenile court did not abuse its discretion in denying the request for a continuance. And, although the court denied counsel's request for a continuance, counsel was not precluded from examining the adoptions specialist and social worker or taking other steps in defense of his client at the section 366.26 hearing. There was no denial of due process.

DISPOSITION

The orders of the juvenile court are affirmed.

                                                      HULL              , J.

We concur:

       BLEASE           , Acting P. J.

       NICHOLSON      , J.